CHESTER W. ROBBINS, Petitioner for Mandamus,

*vs.*

BANGOR RAILWAY AND ELECTRIC COMPANY.

Penobscot.    Opinion November 20, 1905.

*Mandamus.    When Same Lies by an Individual.    Public Service Corporations.*
*Water Company.    Reasonable Regulations.    Water Rates.    Meters and Meter*
*Rates.    Adoption of Contract.    Dwelling House.*

The promoters of a water company contracted with the town for water for
municipal purposes. The contract provided that the promoters should
organize a corporation to which the contract should be assigned. It was
also provided in the contract, among other things, that "the rates for
water used in dwelling houses shall not exceed the following: For each
dwelling house containing a family of not more than four persons, with
one faucet for use within the tenement, five dollars per annum; for each
additional person in the family, fifty cents per annum; for the first wash
hand basin set, two dollars per annum; for each additional hand basin,
one dollar per annum; for one bathing tub, three dollars per annum; for
one additional bathing tub, one dollar per annum; for one water closet,
three dollars per annum; for each additional water closet, one dollar per
annum; for a dwelling house occupied by two or more families, each
family to pay three-quarters of the above rate per annum." The cor-
poration thus provided for was organized, accepted the assignment, and
assumed and agreed to perform all the duties and obligations which the
promoters had agreed to perform, according to the terms of the contract.
The corporation built a system of water works and entered upon the busi-
ness of supplying water to the town, under its contract, and to the inhabi-
tants for power and for domestic purposes. It charged annual, or flat
rates, payable semi-annually in advance, for the supply of water to dwell-
ing houses, according to the terms of the promoter's contract, and to
hotels, boarding houses and other buildings, at other varying amounts.
All the franchises and other property of the water company have now come
to the defendant. Before this petition was brought, the corporation own-
ing the plant revised its schedule of rates, and thereafter charged custom-
ers meter rates, monthly, for all water services, except to "dwelling houses
containing families," the rates for which were left unchanged. The corpo-
ration then classified the petitioner's house as a boarding house, and for
that reason, and also because of an alleged waste of water, put in a meter,
and thereafter charged the petitioner with meter rates. The petitioner,

claiming the building to be a "dwelling house containing a family," declined to pay at meter rates, but tendered the full amount due according to the flat rates for dwelling houses. Thereupon the company shut off the water.

Upon a petition for mandamus, praying for restoration of the service, it is *held*:

1. While a town is not an agent of the individual citizens, and authorized to make contracts binding upon them personally, yet when a person or corporation, as a consideration, or even as a mere inducement for the making of a hydrant contracts with a town for fire purposes, engages to supply water to the inhabitants, at rates not exceeding certain specified sums, and so obtains the contract and its benefits, the contractor is under obligations to fulfil the agreement as to services and rates to individual water takers.

2. If a corporation expressly or impliedly adopts a contract made by its promoters, and thereby obtains its benefits, it must take it with its obligations and burdens. It must do what the promoters agreed to do, and so must all its successors, taking its property rights and franchises by conveyance.

3. Mandamus lies by an individual to compel a water company which is a public service corporation, to supply water to him.

4. A public service corporation, like a water company, may adopt reasonable rules and regulations for the conduct of its business, to which individual water takers must conform. It may require payment for a reasonable time in advance; and it may cut off water from a customer who refuses or neglects to pay reasonable rates.

5. A public service corporation, like a water company, may revise or change its schedule of rates, if no contract prevents, provided that the new rates are reasonable and do not discriminate. Within these limitations a water company may change from an annual or flat rate to a meter rate.

6. In case of unnecessary waste, a water company may apply a meter and charge reasonable meter rates.

7. A house occupied as a place for carrying on the business of keeping boarders, although while prosecuting the business, and as a means of prosecuting the business, the occupant, and his wife and children live in the house also, is not a "dwelling house containing a family", within the meaning of a water contract fixing a rate for dwelling houses containing families, but is a boarding house.

8. Under this definition the court finds that the plaintiff's house was not "a dwelling house containing a family" within the meaning of the contract, and his petition based upon that contention must be dismissed.

9. The petition in this case is not framed to raise the question nor are there sufficient data shown to enable the court to determine, whether the meter rates charged to the petitioner for the house as a boarding house are

excessive or not. Nor does the court say that the rates which the defendant demands are or are not unjust, by reason of unlawful discrimination, in the classification made by it, and in the charges made to the several classes; nor that the defendant has or has not the right to demand as much of the petitioner as it does for the unpaid water service.

On report. Petition dismissed.

Petition for a writ of mandamus to require the defendant company to furnish water to the petitioner at a house owned by him in Old Town, and occupied by a tenant. Heard upon the petition and answer, as upon an alternative writ and return, and at the conclusion of the evidence the case was reported to the Law Court for "determination as to whether a peremptory writ of mandamus shall issue or the petition be dismissed."

All the material facts are stated in the opinion.

*Clarence Scott,* for petitioner.

*E. C. Ryder,* for defendant.

SITTING: EMERY, STROUT, SAVAGE, POWERS, PEABODY, SPEAR, JJ.

SAVAGE, J. Petition for a writ of mandamus to require the defendant company to furnish water to the petitioner at a house owned by him, and occupied by a tenant, in Old Town. The case was heard upon the petition and answer, as upon an alternative writ and return, and at the conclusion of the evidence the case was reported to this court for its "determination as to whether a peremptory writ of mandamus shall issue, or the petition be dismissed." Some technical questions of procedure and pleading have been argued, but as the case comes up on report, it is unnecessary to consider them. *Pillsbury* v. *Brown,* 82 Maine, 450; *Elm City Club* v. *Howes,* 92 Maine, 211; *Rush* v. *Buckley,* 100 Maine, 322.

The essential facts are these. On October 16, 1889, Laughton and Clergue were promoters of a water company to be incorporated in Old Town. In fact the organization had been partly perfected at that time, but the approval of the certificate of incorporation by the Attorney General was not given until October 24, 1889. October 12, the inhabitants of Old Town in town meeting assembled appointed a committee to make a contract with "Laughton & Clergue, or such

corporation as Laughton & Clergue may organize, or with any other party or parties, to furnish and supply the town of Old Town with water for proper municipal purposes." October 16, the committee, acting for the town, entered into a contract with Laughton & Clergue which provided that Laughton & Clergue should organize a corporation, which should accept an assignment of the contract and undertake to carry it out. In the contract the promoters also agreed, among other things, to put in 60 hydrants for the use of the town for fire purposes for a rental named and to be paid by the town. They also agreed to furnish water for a display fountain and for certain other public purposes. The fifth paragraph of the contract reads as follows:

"Said First Party (the promoters) agrees that the rates for water used in dwelling houses shall not exceed the following:—For each dwelling house containing a family of not more than four persons with one faucet for use within the tenement, five dollars per annum. For each additional person in the family fifty cents per annum. For the first wash hand basin set two dollars per annum. For each additional hand basin one dollar per annum. For one bathing tub three dollars per annum. For each additional bathing tub one dollar per annum. For one water closet three dollars per annum. For each additional closet one dollar per annum. For a dwelling house occupied by two or more families, each family to pay three-fourths of the above rate per annum." Thereupon Laughton & Clergue completed the organization of the corporation known as the Penobscot Water & Power Company, to which they assigned the contract. The corporation accepted the assignment and assumed and agreed to perform "all the duties and obligations by said Laughton & Clergue to be performed according to the terms of said contract." Among the corporate purposes of the Penobscot Water & Power Co. was "the construction of water works and laying of pipes in any place or places, and buying, selling or leasing of water." The corporation built a system of water works in Old Town, and entered upon the business of supplying water to the town under its contract, and to the inhabitants for power and for domestic purposes. Annual or flat rates were fixed by the corporation payable semi-annually in advance, for

the supply of water to dwelling houses according to the terms of the Laughton & Clergue contract, and to hotels, boarding houses, and other buildings and places at other and varying amounts.

June 1, 1891, the Penobscot Water & Power Co. conveyed all its franchises and other property to the Public Works Company, by which they were conveyed, April 7, 1905, to the defendant corporation. The business of supplying water to the town or city of Old Town has been carried on continuously by these corporations in succession to the present time. And the water system referred to has been the only source of public water supply for the city or its inhabitants during all this time.

About the beginning of the year 1903 the Public Works Company, then owning the plant, revised and changed its schedule of rates, and thereafter charged customers according to the new schedule. For water supplied to dwelling houses containing families the rates were left unchanged, being the same annual amounts provided for in the Laughton & Clergue contract. All other services were metered, and were charged for monthly according to the amount of water supplied. The charge for water used for power was 11 cents for the first 10,000 cubic feet, 8 cents for the second 10,000 feet and 6 cents per 10,000 feet for all water in excess of 20,000 feet in each month. For all other metered service, including hotels and boarding houses, the charge was 25 cents per one hundred feet for the first 2,000 feet, 20 cents per one hundred feet for the second 2,000 feet and 15 cents per one hundred feet for all water in excess of 4,000 feet in each month.

The petitioner, an inhabitant of Old Town, owned a house on Main street, which was piped for water and connected with the water company's mains. The house was occupied from time to time by tenants, who kept boarders. From the outset down to 1904 this house was classed as a dwelling house, and the company charged and the petitioner paid the annual flat rates for dwelling houses, which were named in the Laughton & Clergue contract. In the later years the tenant's own family consisted of five persons. The number of boarders varied, but was estimated by the company. The company charged and the petitioner paid for 15 persons in the family, boarders and all,

$5 semi-annually. In 1902 or 1903 a water closet was put into the house for which the petitioner paid at the rate of $5 per annum. Prior to January, 1904, the company complained to the owner of waste of water, through defects in piping or plumbing. It also claimed that the house should properly be classed as a boarding house and pay according to the meter rates established for boarding houses. About the beginning of 1904 the company notified the petitioner of its intention to put in a meter. A meter was put in April 6, 1904. In May following a bill was rendered to the petitioner for flat rates from January 1, 1904, to April 1, 1904, and for 3,003 feet of water in April at meter rates for boarding houses. From that time on the petitioner was charged at meter rates. He declined to pay. And on September 10, 1904, the company shut the water off. There was then due according to its rates the sum of $23.71 for water from January 1, 1904. Both before and after the water was shut off the petitioner tendered the full amount due according to the flat rates for dwelling houses, and now offers to pay the same. He prays that the company be commanded to restore his service.

Upon these facts, concerning which there is little dispute, the defendant contends that the petitioner is not entitled to mandamus against it, as a matter of law. It says that the petitioner's rights, if any, rest in contract,—and so far as alleged in the petition,—in the Laughton & Clergue contract, that the contract was made by the town and that the petitioner was not a party to it, or in any privity with the parties, and that mandamus will not lie to enforce contractual duties in any event. Furthermore it is argued that the defendant is not bound by the Laughton & Clergue contract. We will consider the last proposition first.

It is not necessary to inquire when and how far and in what manner a corporation is bound by the engagements entered into by its promoters. It is at least settled that if the corporation adopts such a contract expressly or impliedly, and obtains its benefits, it must take it with its obligations and burdens, cum onere. It must do what the promoters agreed to do. 23 Am. & Eng. Ency. 241; 10 Cyc. 262; note to *Pittsburg Mining Co.* v. *Spooner,* 17 Am. St. Rep. 161. In this case the Penobscot Water & Power Company

took an assignment of the Laughton & Clergue contract and its benefits and expressly assumed its obligations. That contract limited the rates for water supplied to dwelling houses containing families. The corporation became bound by that limitation. While a town is not an agent of the individual citizens and authorized to make contracts binding upon them personally, we have no hesitation in saying that when a person or corporation as a consideration, or even as a mere inducement for the making of a hydrant contract with a town for fire purposes, engages to supply water for the inhabitants at rates not exceeding certain specified sums, and so obtains the contract and its benefits, the contractor is under obligations to fulfil the agreement as to service and rates to individual water takers. And the rights of the Penobscot Water & Power Company, with the corresponding duties and obligations, have come to the defendant.

It is true that mandamus is not the proper remedy for the enforcement of mere contractual duties. It does not lie to enforce rights of a private or personal character, or obligations resting entirely upon contract, and not involving any question of trust or official duty, or growing out of public relations. 2 Spelling on Extraordinary Relief, sect. 1379. But that is not the situation in this case. The defendant is a public service corporation. By undertaking a public service, namely that of furnishing a supply of water for the public, it comes under obligations to the public, not only to the public as a whole, but to the public as individuals, and that independent of its contract duties. It must serve impartially, or on equal terms and at reasonable rates, all who apply for service. Indeed, from the existence of such a public duty, the law will imply a contract, if necessary, with each of the inhabitants served. *McEntee* v. *Kingston Water Co.*, 165 N. Y. 27. It is the duty of the defendant as a public service corporation to supply water to this petitioner at reasonable rates, fairly and without discrimination. *Kennebec Water District* v. *Waterville*, 97 Maine, 185. The duty is a public one which does not depend on the Laughton & Clergue contract, although that limits the maximum rate in some instances, but it arises from the character of the service it undertakes to perform. Because a duty of this kind is public each owner of a building which may be served is entitled

to have the water served to him. That is his particular, personal right, and is independent of the rights that others or the general public may have. He does not hold that particular right in common with the public. Mandamus lies to enforce the performance of public duties. It does not lie at the suit of an individual for the enforcement of those rights which he holds in common with the public at large, but it · does lie when his personal and particular rights have been invaded beyond those that he enjoys as a part of the public and that are common to everyone. *Sangerville* v. *County Commissioners,* 25 Maine, 291; *Baker* v. *Johnson,* 41 Maine, 15; *Weeks* v. *Smith,* 81 Maine, 538; *Knight* v. *Thomas,* 93 Maine, 494. The petitioner therefore, may prosecute the writ.

It is not questioned but that a public service corporation, like a water company, may adopt reasonable rules and regulations for the conduct of its business, to which the individual water takers must conform, that it may require payment for a reasonable time in advance, or that it may cut off water from a customer who refuses or neglects to pay reasonable rates. *Wood* v. *Auburn,* 87 Maine, 287. And we think there can be no question of the right of such a corporation to revise and change its schedule of rates, if no contract prevents, provided that the new rates are reasonable and do not discriminate. Within these limitations it may change from an annual or flat rate to a meter rate. In fact a reasonable meter rate seems the more equitable and just. We have recently discussed what are reasonable rates in *Kennebec Water District* v. *Waterville,* 97 Maine, 185 and *Brunswick & Topsham Water District* v. *Maine Water Co.,* 99 Maine, 371, and this case calls for no further discussion. Nor do we think there can be any doubt that in case of unnecessary waste the company may apply a meter, and charge reasonable meter rates. Again while it may be lawful to classify water takers, not arbitrarily, but upon reasonable grounds, as for instance as between boarding houses and private dwelling houses, and while it may be true in instances that a charge to small customers is not necessarily unreasonable because in excess of what a large customer would have to pay, for the same amount of water, still as bearing upon the question of discrimination it must be true that the quantity of water used and the cost of the individual

service are the principle elements for consideration in fixing the charges as between individual water takers or classes of takers. And it has been held that a public service company cannot make a difference in price according to the use made by the customer, nor is a discrimination proper based on the value of the service to the customer, *Bailey* v. *Gas-Fuel Co.*, 193 Pa. St. 175; *Richmond Nat. Gas. Co.* v. *Clawson*, 155 Ind. 659; 51 L. R. A. 744. And, of course, the water company had the right to establish reasonable rates for service to all customers not provided for in the Laughton & Clergue contract.

An application of these principles will eliminate from further consideration all essential questions except two, and these are questions of fact. The petitioner bases his claim upon the dwelling house clause in the Laughton & Clergue contract. He says that his house was a "dwelling house containing a family" within the meaning of that contract and therefore, that the maximum charge for a family of fifteen exclusive of the water closet was $10 a year, and further that the family in the house did not exceed fifteen in number. All his tenders and his offer in the petition to pay are limited upon that theory. And if it were otherwise, the record does not disclose sufficient data to enable the court to pass upon the reasonableness of the meter rates themselves. The defendant on the other hand claims that the building is not a dwelling house within the meaning of the contract, but is a boarding house, and further that its predecessor was justified in putting in a meter, by reason of the unreasonable waste of water.

The decisive question, and the only one we need to consider, is whether the petitioner's building was a "dwelling house containing a family" as specified in the original contract, or was a boarding house. It is urged in the first place that the company itself has so classified it for quite a long period of years, and that in consequence its status is now fixed beyond the power of the company to change. The construction which the parties by their acts place upon a contract frequently is, in cases of doubt, of great value in determining what the contract meant. And when by long continued usage they have given a practical construction to it, it may be beyond the power of one party to change it. *West Hartford* v. *Water Commissioners of*

*Hartford,* 68 Conn. 323. But if we were to assume that such a usage should control, it ought to be a usage which has been practically fixed and unvarying. The case shows that all three of the tenants who have occupied the house since the petitioner bought it have kept boarders, but to what extent and under what conditions the two earlier tenants kept them does not appear. And as we shall hereafter see, the mere fact that boarders are kept in a house is not necessarily inconsistent with the claim that it is a "dwelling house containing a family." Moreover the house was first classified at a time earlier than the petitioner's ownership, and the record shows nothing in regard to the nature of the occupancy at that time, except that boarders were kept. This ground therefore is not tenable, and we must inquire further.

The building itself seems to have been built originally for family use. But it had been used by tenants for keeping boarders and was being so used when the meter was put on. The tenant, his wife and three sons lived there. The number of boarders was as low as three at times, and at others as high as ten, and perhaps more. The boarders were not transients. They stayed more or less permanently. The word "dwelling-house" does not always have the same sense in all cases. It may mean one thing under an indictment for burglary or arson, and another under a homestead law, and another under a pauper law, and another under a contract or devise. A boarding house certainly is a dwelling house. So is a hotel. Or a jail. *People* v. *Van Balrcum,* 2 Johns. 105. Or a single room. *People* v. *Horrigan,* 68 Mich. 491.

But the Laughton & Clergue contract limited the meaning which might be given to the word dwelling house. The phrase there is "dwelling house containing a family." The word family is also of flexible meaning. The meaning varies as the question arises under homestead laws, or exemption laws, or pauper laws, or under insurance policies or wills, or other conditions. Its primary meaning is a collection of persons who live in one house and under one head or management. *Dodge* v. *Boston & Prov. R. R.,* 154 Mass. 299. In that sense it has frequently been defined as synonymous with household. Webster gives the primary meaning as "persons collectively

who live together in a house or under one head or manager; a household, including parents, children, and servants, and as the case may be, lodgers or boarders." This definition is sometimes quoted in the cases, but we have found no case sustaining the definition as to boarders in which the matter of boarders was in issue or decided, except two, and they were decided on grounds not involved here. *Oystead v. Shed,* 13 Mass. 520; *Race v. Oldridge,* 90 Ill. 250; 32 Am. Rep. 27. To constitute the family relation between persons so living together it must be of a permanent and domestic character, and not of those abiding together temporarily as strangers. *Tyson v. Reynolds,* 52 Iowa, 431. They must be living in one domestic establishment. *Pearson v. Miller,* 42 Am. St. Rep. 470. Family means all whose domicil or home is ordinarily in the same house and under the same management or head. *Cheshire v. Burlington,* 31 Conn. 326. It is all the individuals who live together under the control of another, including the servants. *Poor v. Hudson Ins. Co.,* 2 Fed. 422. It embraces a household composed of parents or children, or other relatives, or domestics. In short every collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness. *Wilson v. Cochran,* 98 Am. Dec. 553. It may mean the husband and wife, having no children, or it may mean children, or wife and children, or any group constituting a distinct domestic or social body. *Grand Lodge v. McKinstry,* 67 Mo. Appeals, 82. Lord Kenyon said "In common parlance the family consists of those who live under the same roof with the pater familias; those who form (if I may use the expression) his fireside." *The King v. Darlington,* 4 Term Rep. 800. The relation is one of social status, not of mere contract, and usually is held to include a legal or moral obligation on the head of the family to support the other ·members, and a corresponding state of dependence on the part of the other members for their support. 3 Words and Phrases, 2673 and cases, cited.

If the foregoing definitions gathered from the cases give a correct view of the various phrases of a family relationship as applicable to this case, from the judicial point of view, as we think they do, it is

clear that boarders do not constitute the family or a part of it. A
family living together in a house as a home is none the less a family
because incidentally there are boarders in the same house, and per-
chance eating at the same table. But a boarding house is none the
less a boarding house, when used as such, because the boarding house
keeper and his wife and children live in it while the business of
keeping a boarding house is being carried on. The Laughton &
Clergue contract limited the rates for "a dwelling house containing
a family" to annual flat rates for specified amounts. It contem-
plated as we think a dwelling house containing a family living
together in domestic and social relations in the house as a home, and
not as a place of carrying on the business of keeping boarders. The
test is whether the petitioner's tenant occupied the house as a home
for himself and his wife and children, and incidentally kept boarders
also, or whether he occupied it as a place for carrying on the business
of keeping boarders, although while prosecuting the business and as
a means of prosecuting the business, he and his wife and children
live in the house also. Under this test, neither the size of the house,
nor the number of the boarders are of importance, except as evidence
that may have weight in determining which is the principle use for
which the building is occupied.

Applying this test to the evidence in this case, we are satisfied that
the petitioner's house should be classed as a boarding house, and that
it is not within the limitation for dwelling houses in the Laughton &
Clergue contract. The tenant used the house for carrying on the
business of keeping boarders, and his living there was incidental to
that business. That was his business, and his only business of any
consequence, as he testified.

Accordingly the petitioner's claim is not sustained, and his petition
must be dismissed. But we decide nothing more. The petition is
not framed to raise the question whether the rates charged to the
petitioner for the house as a boarding house are excessive or not.
Neither as we have already said is there sufficient evidence upon
which to answer such a question. Nor do we say that the rates
which the defendant demands are or are not unjust by reason of
unlawful discrimination in the classification made by it, and in the

charges made to the several classes, nor that the defendant has or has not the right to demand as much of the petitioner as it does, for the unpaid water service. When a customer charges 25 cents a hundred feet to one customer for one use, and only 11 cents for ten thousand feet to another customer for another use, if the water be supplied from the same source, by the same system, in the same pipes, there is an apparent discrimination, but whether it is real or not cannot now be said. See *Bailey* v. *Fayette Gas-Fuel Co.* and *Richmond Nat. Gas Co.* v. *Clawson,* supra.

*Petition dismissed.*