SIDNEY ROSENBLATT, complainant,

*v.*

ABRAHAM LEVIN and EDWIN LEVIN, defendants.

[Decided April 15th, 1940.]

*Mr. John Rauffenbart,* for the complainant.

*Messrs. Endicott & Endicott,* for the defendants.

Sooy, V. C.

Complainant seeks to enjoin defendants from "using and permitting the aforesaid dwelling house to be used in any other manner than a private dwelling house" and "from causing or permitting loud noises to emanate" therefrom.

The basis of complainant's asserted right to an injunction is a restrictive covenant imposed upon the land by the original developers of the restricted tract, of which covenant defendants were admittedly aware at the time they became lessees of the premises and of which they were fully advised, not only during the period they occupied the premises as lessees, but also when they took title thereto, and under the evidence there may be no doubt but that defendants' possession and subsequent ownership was and is subject to the covenant.

The covenant which the complainant seeks to enforce is— "that no building except for cottage resident purposes or hotels or drug stores shall be erected on any part of said land." The covenant recites "that the object of the covenants is to secure the health, beauty, ornamentation and value of the premises" and a reading of the entire covenant results in a determination that the language used therein was intended to and did create a neighborhood scheme. *Scull* v. *Eilenberg, 94 N. J. Eq. 759; 121 Atl. Rep. 788; DeGray* v. *Monmouth Beach Club House Co., 50 N. J. Eq. 329; 24 Atl. Rep. 388; Clarke* v. *Kurtz, 123 N. J. Eq. 174; 196 Atl. Rep. 727; Shoyer* v. *Mermelstein, 93 N. J. Eq. 57; 114 Atl. Rep. 788; La Felra* v. *Beveridge, 124 N. J. Eq. 24; 199 Atl. Rep. 70.*

The restriction was imposed in July of 1899 on a large tract of land in Atlantic City, bounded on the south by the Atlantic ocean, on the east by Raleigh avenue, on the west by Columbia avenue and on the north by the Meadow Line. This Meadow Line, so-called, generally speaking is 100 feet south of Ventnor avenue.

The evidence discloses that the occupants of the restricted tract have built their buildings thereon and occupied them in obedience to the restrictions, excepting as to the defendants' premises, which is known as No. 60 South Delancy Place,

and the evidence further discloses that that property, during the years 1938 and 1939, was occupied as a rooming house and, further, that in the years 1916 to 1922 one Mrs. Washburn occupied the property as a private sanitarium for contagious diseases, under circumstances hereinafter to be related.

Defendants admit that they are now using the building at No. 60 Delancy Place aforesaid as a rooming house and boarding house and they allege it was so used in the year 1938 by a tenant then in possession thereof. The defenses are that the operation of a rooming house is not prohibited by the restrictions aforesaid, nor is the operation of a boarding house contrary to the general objects and purposes of the restrictions, and that the complainant is guilty of laches.

Taking up the use of defendants' property in 1916 to 1922 by Mrs. Washburn, we find that it was, in fact, so used by her and that Dr. Marshall sent patients there for treatment of contagious diseases, that he knew of other patients being there during that period, and a Mr. VanDyne, a hotel clerk, sent patients there, and certain of the hotels of Atlantic City contributed to the support of the property as a sanitarium during the period aforesaid. Neither of these witnesses ever saw a sign on the premises advertising it as a place for such purposes and I am satisfied that there was no public advertisement of Mrs. Washburn's willingness and ability to use the property as a sanitarium. In fact, Mr. Scanlon, residing in the neighborhood during the aforesaid period and ever since, never knew of such use, nor did Mr. O'Neill and his wife, who lived on the opposite corner from said property and who occupied his residence as a summer home, bought it with knowledge of the restriction and because it was in a restricted neighborhood. He knew Mrs. Washburn by way of a speaking acquaintance and never suspected the existence of a sanitarium at that address. I am satisfied that Mrs. Washburn operated secretly and that the fact that she was violating the restriction was not known by her neighbors. It is absurd to think that what is commonly referred to as a "pest house" would be allowed to operate by owners of property and occupants in this neighborhood, and this irrespective of any restriction.

As to occupancy during 1938 and 1939, there is no doubt but that in 1938 defendants' property was unoccupied until the summer, when a tenant moved in, but it also appears that complainant, having rented his home, did not have cause for complaint as to the use of defendants' property, but that there was an organization known as the Chelsea Protective League, whose officers protested vigorously to the city authorities and attempted to prevent such occupancy.

In the succeeding year, 1939, defendants having entered into possession, put up a sign "To open April 15th as a Rooming House," and during the summer complainant made vigorous complaints to the city authorities, as well as to the Chelsea Protective League, and the latter attempted to prevent the occupancy and, after failure so to do through attempts to re-zone under ordinance, this bill was filed.

Defendants entered into possession of the premises under a lease dated December 24th, 1938, in which it was provided that they should not occupy the premises "nor use nor permit any part thereof to be used for any other purpose than a rooming house."

In the lease aforesaid the defendants agreed to purchase the property, at an outlay of $17,000, settlement to be made on or before September 15th, 1939, and it was expressly provided in the agreement for purchase, which was incorporated in the lease aforesaid, "It is expressly agreed between the parties hereto that the demised premises are to be used as a rooming house," and the agreement further provided that if the defendants should be made defendants in any proceeding for violation of the zoning ordinance of Atlantic City, or should be enjoined by reason of violation of the restriction imposed against said property, that the provision for the sale and purchase of the premises would be null and void.

Complainant, on September 7th, 1939, advised the defendants that he had been informed of the defendants' intention to purchase the property and notified defendants "that should you continue to violate the restrictive covenant by conducting a rooming house on the premises, a bill for injunction to restrain you from continuing so to do will be filed in our Court of Chancery."

Notwithstanding this warning, defendants purchased the property in accordance with their agreement so to do, as heretofore recited, and complainant filed his bill on November 13th, 1939.

I do not find that complainant is guilty of laches which bars him from the relief he seeks. His efforts and those of the League fully advised defendants that the operation of a rooming house was over their protests, and the defendants purchased with full knowledge of the restriction and the fact that all other property owners in the tract were occupying their properties in conformity therewith. In fact, defendants purchased in defiance of the covenant and in face of complainant's written protest, and not only that, but they took title under an agreement which did not compel them so to do, so that an estoppel has not arisen and it may not be said that there has been unreasonable delay on complainant's part.

We start out with the proposition, which must at all times be kept in mind, that the defendants did not lease the property in the inception of their occupancy for the purpose of using it as a dwelling house and incidently use it for renting out a spare room or rooms to others, but that they leased the property for the express purpose of conducting the business of a rooming or boarding house, and that they so conducted it throughout 1938 and 1939 and intend to continue the business unless restrained.

The fundamental rule in construing restrictive covenants of this kind is that the intention of the parties, as shown by a fair interpretation of the language of the covenant as used by the parties imposing it, governs, and that if the language of the covenant is ambiguous the interpretation should be against the covenant, it being restrictive of the otherwise free use of property by its owner.

It would seem to me that the intention of the covenant as imposed is to prevent the buildings to be thereafter erected on the lands from being used for business purposes other than hotels and drug stores, because the hotel and drug store business is expressly mentioned as being permitted, hence impliedly at least, excludes other businesses than those mentioned. This under the doctrine *"expressio unius est exclusio*

*alterius."* If this is so, defendants are clearly violating this intention by using the premises for the business of conducting a rooming and boarding house. They leased it for that purpose and admit that they so use it and, as said before, they are not using the property as a cottage resident with a mere incidental renting of spare rooms. They are clearly conducting and using the property for business purposes and not as a cottage residence.

In *Trainor* v. *LeBeck, 101 N. J. Eq. 823; 139 Atl. Rep. 16,* the distinction between a boarding house and a private dwelling is pointed out by Mr. Justice Black, quoting *Robbins* v. *Bangor Railway Co., 100 Me. 496, 497; 62 Atl. Rep. 136,* as follows:

"Thus 'the test is whether the petitioners' tenant occupied the house as a home for himself and his wife and children, and incidentally kept boarders also, or whether he occupied it as a place for carrying on the business of keeping boarders, although, while prosecuting the business and as a means of prosecuting the business, he and his wife and children live in the house also. Under this test, neither the size of the house nor the number of the boarders are of importance, except as evidence that may have weight in determining which is the principal use for which the building is occupied.' "

It is argued that since the covenant permits the operation of a hotel, the object thereof to secure "the health, beauty, ornamentation and value of the premises" will not be affected by permitting a boarding house. To so hold would defeat the very purpose of the purchase of property by the residents of this tract, who paid a consideration based on their knowledge of the restriction, and the value of the property would be seriously affected, even if the beauty and ornamentation, and possibly health, might not be. Complainant, for instance, required rest and quiet by reason of certain physical impairments, and sought this in this restricted neighborhood where, at the time of his purchase, no visible violation had occurred and where, with the exception of the defendants and the case hereinbefore referred to, all of the owners of property respected the covenant and refrained from violating it, and where all the owners of property, with the exception of

defendants, have gone to the expense of employing investigators to ascertain whether or not the properties were being operated in violation of the restrictions.

A restrictive covenant such as the one under consideration, in a seaside resort, means much to those who desire to be isolated from the annoyance consequent upon an influx of roomers and boarders, particularly during the summer, and the areas in which the encroachment of such houses has not made its presence obnoxious are few. The value, therefore, of property where, by constant vigilance, the restrictions have been enforced, is largely in excess of the unrestricted zones. True, municipal authorities have endeavored to protect residential areas by zoning ordinances, but experience has shown that these ordinances may be easily amended, and the value of a permanent restrictive covenant is still the safe means of protecting values in these areas.

It is also argued that the covenant applies only to the type of house to be erected and not to the use to which it is put. This argument is unfounded. The covenant confines the building to be erected to "cottage resident purposes" and as said by Mr. Justice Garrison in *Fortesque* v. *Carroll, 76 N. J. Eq. 583; 75 Atl. Rep. 923,* "the word 'residence' directs attention solely to a use or mode of occupancy." It is true that the verb "erected" is used in connection with the restriction, but as also pointed out in the above case, "a covenantee may * * * impose restrictions that * * * relate solely to matters of use, or that * * * relate to and cover both" use and construction.

In *Jones* v. *Mulligan, 121 Atl. Rep. 608,* Vice-Chancellor Ingersoll held that the language "cottage resident purposes" is of uncertain and indefinite character, and so it is when applied to the erection of a one or two-family house, as was the case under consideration by that vice-chancellor, but this is not so when the question is whether a rooming house or boarding house business may be conducted under the restriction herein.

It is also argued that there is no distinction between a hotel and a boarding house such as would be contrary to the objects of the covenant, and it may be that in the present day,

since the old Inns and Taverns act, under which the licensee of such a place was required to provide stabling for horses, &c., the sharp distinction of that era no longer exists, but the restrictions in this case speak as of the time they were imposed, at which time there may be no doubt there was such a difference that permission to erect and conduct a hotel did not, impliedly or otherwise, permit a rooming house or boarding house. This distinction was pointed out in *Atlantic City* v. *Hemsley, 76 N. J. Law 354; 70 Atl. Rep. 322,* wherein (at *p. 356*), the court said:

"Generally speaking, the distinction between an inn and a boarding house is that into the former all travelers have a right to enter and demand accommodations, but the keeper of a boarding house has a right to select his guests."

It is true that the statutes have extended the right of lien for board and lodging to rooming and boarding houses (*R. S. 2:60-48*), but this is beside the point in question, and as said in the *Hemsley Case* (at *p. 357*):

"Whether or not a particular place is an inn or a boarding house is a question of fact depending on the intention of the proprietor."

The defendant, as heretofore noted, leased "for rooming house purposes" exclusively.

I have not considered the Petroff-Emley restriction because complainant admits that he is unable to connect its imposition as being for the benefit of complainant.

The complainant is entitled to a decree restraining the defendant from operating or conducting a rooming house or boarding house business on the premises described in the bill of complaint.