**AFOA L. SU`ESU`E LUTU, Petitioner**

**v.**

**SAVALI TALAVOU ALE, Speaker of the House of Representatives, and SAVALI SAVALI, JR., Legislative Financial Officer, Respondents**

High Court of American Samoa
Trial Division

CA No. 25-95

May 19, 1995

Before KRUSE, Chief Justice, and BETHAM, Associate Judge.

Counsel: For Petitioner, Marshall Ashley
 For Respondents, Aitofele T. Sunia

Opinion and Order on Petition for Writ of Mandamus:

This case concerns the right of a Legislator in his legislative capacity, or in his capacity as a private citizen, to obtain information regarding the financial affairs of the Legislative body in which he serves.

## HISTORY

Representative Afoa L. Su`esu`e Lutu ("Petitioner") brought this action seeking a writ of mandamus to compel Savali Talavou Ale, Speaker of the American Samoa House of Representatives ("the Speaker") and Savali Savali, Jr., Legislative Financial Officer ("LFO") to allow Petitioner to review and receive copies of House expenditures and overruns for the year

1994. This court action followed a series of verbal and written communications by Petitioner, addressed to both respondents, requesting "a breakdown of the 1994 House expenditures." In a letter dated February 17, 1995, the LFO indicated that the Speaker had not yet given his approval, and that the LFO did not have authority to release the information without such approval. At the hearing held April 19, 1995, Petitioner indicated his desire to inspect House records concerning travel authorization, hiring and termination of employees, and other personnel records and expenses.

## STANDARD OF REVIEW

■ The standard for granting the peremptory writ of mandamus, as set forth in T.C.R.C.P. 90, is interpreted by the High Court as follows:

> The extraordinary writ of mandamus will not be issued unless: (1) the plaintiff has a plain right to have the act performed; (2) the defendant has a plain duty to perform it; and (3) there is no other adequate remedy available to the plaintiff.

*Mulitauaopele v. Maiava*, 24 A.S.R.2d 97, 98 (Trial Div. 1993) (citing *Gifford Pinchot Alliance v. Butruille*, 742 F. Supp. 1077, 1082-83 (D. Ore. 1990); *see Siofele v. Shimasaki*, 9 A.S.R.2d 3, 11 (Trial Div. 1988); *Beckless v. Heckler*, 622 F. Supp. 715, 720 (N.D. Ill. 1985) (citing *Kennecott Copper Corp., Nevada Mines v. Costle*, 572 F.2d 1349, 1356 (9th Cir. 1978); *City of New York v. Heckler*, 742 F.2d 729 (2d Cir. 1984), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986))).

## DISCUSSION

Petitioner claims authority to examine the relevant documents based on his status as a Legislator and on the theory that the documents are public records.

## I. *Petitioner's Right as a Legislator*

Petitioner claims a special right to review the requested documents, arising from his status as a member of the American Samoa House of Representatives pursuant to A.S.C.A. § 10.0603, which states: "Except as otherwise limited by law, the Legislature shall have full authority and control the request, approval, and disbursement of funds in its budget. The Legislature shall be fully responsible for maintaining proper record-keeping and management over the expenditure of funds."

45

Petitioner claims that the duties of the Legislature also belong to him as one of its members, and that he is unable to adequately perform those duties without access to relevant information. This analysis begs the question of whether either Petitioner or the Speaker is "the Legislature" within the meaning of the foregoing language.

■ The Revised Constitution of American Samoa, art. II § 1 provides the most plain definition of "Legislature" available, stating: "There shall be a Legislature which shall consist of a Senate and House of Representatives." Accordingly, neither Petitioner nor the Speaker is "the Legislature" within the meaning of A.S.C.A. § 10.0603, and it is doubtful whether Petitioner is justified in bootstrapping himself individually to the rights and responsibilities of the Legislature as a whole. The language of the statute itself suggests the intention of giving the Legislature control over its own budget instead of having its budget managed by an agency within the executive branch. We conclude that the language of A.S.C.A. § 10.0603 does not contemplate or give any direction regarding the disclosure of financial records to individual members of either house, and falls well short of creating the "plain duty" and "plain right" required for the issuance of a writ of mandamus. This conclusion, however, does not end the argument.

■ Petitioner further claims the right to review the relevant documents pursuant to A.S.C.A. § 2.0601(b), which gives direction to the LFO regarding how information is to be distributed: "Unless otherwise *directed by a Legislator making [a] request for information*, the request and the resulting work product shall first be submitted to the Legislator who requested it before it is distributed" (emphasis added). Petitioner contends that the foregoing language entitles him to receive the information he requests before it is distributed to anyone else, including the Speaker. The question of who receives information first does not directly resolve the question of what information is accessible to Petitioner in the first place, but the foregoing statute does clearly imply that an individual "Legislator" has the right to make a "request for information" to review the resulting work product.

■ In turn, the LFO has very broad authority to gather the requested information pursuant to A.S.C.A. § 2.0602. This enactment provides:

> The agencies of the government shall cooperate with the Legislative Financial Officer in order that he may carry out the investigations, studies, analyses, and reports so *directed to him by the Legislature*, by opening their records to the officer during

46

normal working hours and times (emphasis added).

Reading the foregoing language together with A.S.C.A. § 2.0601(b), an individual Legislator seems to have the authority of the entire Legislature for purposes of gathering information through LFO. The words "directed to him by the Legislature" cannot mean that a majority in both houses of the Fono must approve work requests for LFO, since individual Legislators have the right to make confidential work requests, and to review the results of such requests prior to their distribution to others. It would be similarly absurd to read the foregoing statute as requiring approval from the Speaker for the same reason. This contention is strengthened by the language of A.S.C.A. § 2.0601(a) which reads, in relevant part:

> There is created a Legislative Financial Office. The Head of the Office is the Legislative Financial Officer, who is appointed by the President of the Senate and the Speaker of the House and compensated by the Legislature. The office is directly responsible to the Legislature . . . .

In drafting the foregoing language, the Fono had the opportunity to make the LFO directly responsible to the President of the Senate ("the President") and to the Speaker. Instead of doing so, the Fono placed language in the statute making the office "directly responsible to the Legislature" immediately following its instruction that LFO be "appointed" by the President and the Speaker. This language indicates that, despite being appointed by Fono leaders, the LFO is "directly responsible to the Legislature," rather than being indirectly responsible to it via the leadership.

■ The Speaker contends that House Rule I § 11(C) permits him to refuse *requests for House documents, and to prevent LFO from releasing* information concerning the House. The rule reads, in relevant part:

> All requests for information or documents from the House must be referred to the Speaker's office for approval. . . . The Legislative Financial Office may not release any information concerning the House without prior approval of the Speaker.

Each house in the Legislature has the constitutional right to "determine its rules of procedure." REV. CONST. AM. SAMOA, art. II § 11. The LFO, however, is not a committee of the House of Representatives nor in any other way a part of that House. The LFO is responsible to the

Legislature, not to rules enacted through one house only. A House rule using language that "The Legislative Financial Office may not . . ." exceeds the constitutional power of a single house to make rules of procedure for itself. Furthermore, regardless of whether the requested information concerns the House, A.S.C.A. § 2.0601(b) requires that ". . . the request and the resulting work product shall first be submitted to the Legislator who requested it before it is distributed." The House rule requiring that the Speaker review materials prepared by LFO before their submission to the Legislator requesting the work offends the plain language of the statute, and is therefore invalid insofar as it purports to countermand statutory mandate.

■ The rule that "[a]ll requests for information or documents from the House must be referred to the Speaker's office for approval," is perhaps an acceptable procedural rule, but it cannot be used by the Speaker to circumvent codified law and displace substantive rights. A constitutionally authorized rule of "procedure" loses its procedural character when it determines the status of substantive legal rights.[1] In this case, House Rule I § 11(C) was used to defeat A.S.C.A. § 2.0602, which reads:

> The agencies of the government shall cooperate with the Legislative Financial Officer in order that he may carry out the investigations, studies, analyses, and reports so directed to him by the Legislature, by opening their records to the officer during normal working hours and times.

In other words, when the LFO presents an agency of government with a request, no approval is necessary. The agency is legally required to cooperate during normal working hours and times.

This analysis, however, begs the question of whether or not the House of Representatives, or perhaps the Speaker's office, is considered an "agency" within the meaning of the statute. In the narrow sense of the word, "agency" probably means an organization within the executive branch. We think that a broader definition is appropriate in this case. The chapter creating LFO is preceded by a chapter creating the Legislative

---

[1] The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. *United States v. Ballin*, 144 U.S. 5 (1892); *see by analogy* 28 U.S.C.A. § 2072 ("Such [procedural] rules shall not abridge, enlarge, or modify any substantive right . . . .").

Reference Bureau with the language, "There is, *as an agency within the Legislature*, a legislative reference bureau for the use of the members of the Legislature." A.S.C.A. § 2.0501 (emphasis added). The common sense meaning of A.S.C.A. § 2.0602 is that "agencies of government" include organs of government within all three branches, including "an agency within the Legislature" such as the Legislative Reference Bureau, the House of Representatives itself, or the office of the Speaker.

■ We find that the office of the Speaker is an "agency" within the meaning of A.S.C.A. § 2.0602, and therefore the Speaker has a plain duty to cooperate with LFO by opening his records to LFO within normal working hours and times. LFO in turn has a plain duty to make its work product available to the Legislator requesting it, prior to distributing it to anyone else, including the Speaker. Accompanying these duties the Legislator has a plain right pursuant to A.S.C.A. § 2.0601(b) to request information from the LFO, and to review the work product before it is distributed to anyone else.

## II. Petitioner's Right as a Private Citizen

■ The writ of mandamus is meant to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief, and if the defendant owes him a clear, indisputable, and non-discretionary duty.

### A. Individual Right or Held in Common with the Public?

Petitioner claims a right to the sought information because it is public record. This argument gives rise to the question of whether petitioner impermissibly seeks to enforce a right which he holds in common with the public.

The Supreme Court of Maine granted a writ of mandamus in *Robbins v. Bangor Ry.*, 62 A. 136, 139 (Me. 1905), holding that each and every building owner had an individual right to utility service at a reasonable rate, and that this right was individual, and not held in common with the public. The *Robbins* court further explained that the petition may not be granted to enforce rights which are common to everyone and enjoyed by the public at large.

A similar issue arose in *Mellinger v. Khun*, 130 A.2d 154 (Pa. 1957). In that case, the appellant was incensed at receiving a citation after the parking meter adjoining his vehicle had expired, when he saw that a lunch wagon parked in the same lot for 39 hours continuously had not been

49

cited. *Id.* at 155. The appellant sought a writ of mandamus to compel prosecution of the owner of the lunch wagon. The *Mellinger* court held that the benefit of open parking spaces (protected by the enforcement of time limitations) was a right which appellant held in common with the public at large and not an individual right which he was entitled to enforce on a particular occasion. The petition was therefore denied.

■ The question arises whether Petitioner's petition is closer to the *Robbins* case, where petitioner's "personal and particular rights have been invaded beyond those that he enjoys as part of the public, and that are common to everyone," *Robbins,* 62 A. at 139, or whether it is closer to the facts in *Mellinger,* where the petitioner sought to enforce the rights of the public in general. We find the facts closer to *Robbins*.

Public policy may be in place to make it more likely that one can find a parking space, but a writ of mandamus may not compel that the policy be enforced whenever a particular individual is frustrated at being unable to find a space on any given occasion. A parking space is not an individual guarantee. One may compel a utility to deliver service because, unlike a parking space, he/she has an individual right to that service.

If the information Petitioner seeks is public record, it may be argued that each and every member of the public has an individual right to review it, subject to the balancing principle discussed below, just as every building owner has an individual right to utility service in *Robbins*.[2]

---

[2] This position was rejected in *Nowack v. Fuller*, 219 N.W. 749, 751 (Mich. 1928):

> [I]n the instant case, the plaintiff as a citizen and taxpayer has a common-law right to inspect the public records in the auditor general's office, to determine if the public money is being properly expended. It is a right which belongs to his citizenship. It is a right which he holds in common with all other citizens, a public right, which can be enforced only by mandamus proceedings brought by the Attorney General. It is not and never has been the policy of the law to permit private individuals to the use of the writ of mandamus against public officers, except in cases where they had some special interest not possessed by the citizens generally.

(Citations omitted.) The *Nowack* Court, however, granted the writ to a private citizen, based on a "special interest" arising from facts very similar to those in the present case:

> The plaintiff has not sought to enforce his rights through the office of the Attorney General. He has begun this suit in his own name. In order to maintain it, he must show that he has a special interest, not possessed by the citizens generally. Apart from his public interest, his petition shows that he has been hampered and injured in his business

50

## B. Financial Reports of the Legislature Public Record

 Any record which is required by law to be kept, or is kept in furtherance of some other duty required by law, or which is meant to serve as a memorial of something done by a person in his/her capacity as a public official, is a public record. *Nero v. Hyland*, 386 A.2d 846, 851 (N.J. 1978); *Mathews v. Pyle*, 251 P.2d 893, 895 (Ariz. 1952). It is arguable that an "official record" is one kept pursuant to the official duty of a particular officer, even if not specifically mandated by statute. *Fargnolli v. Cianci*, 397 A.2d 68, 76 n. 9 (R.I. 1979).

A.S.C.A. 10.0603 states:

> Except as otherwise limited by law, the Legislature shall have full authority and control the request, approval, and disbursement of funds in its budget. *The Legislature shall be fully responsible for maintaining proper record-keeping* and management *over the expenditure of funds* (emphasis added).

The foregoing language is an explicit requirement that the Fono keep the records requested by Petitioner. Since the Fono is required by law to keep financial records, such information is "public record."[3]

## C. The Effect of Public Record Status

 Under the common law of access to public documents, the right to review public records is not absolute. *Nero*, 386 A.2d at 851. The law

---

> by the refusal of defendant to allow him to inspect the records in his office. Is it a sufficient interest to entitle him to the aid of the court by this writ of mandamus? We think so. He is the manager and editor of a newspaper. It is published and circulated in Michigan. He sells news to the people through the medium of his paper. In a proper and lawful manner, he has a right to publish matters of public interest. The citizens and taxpayers of this state are interested in knowing whether the public business is being properly managed. By denying him access to the public records for the purpose of securing such information, he is deprived of legal rights for which he is entitled to redress by the writ of mandamus.

*Id.* at 451-52. Certainly, if publishing a newspaper to inform citizens regarding "public business" creates a "special interest" enforceable by a writ of mandamus, serving as a Representative and performing "public business" must also be a "special interest."

[3] Legislative journals are public record. *Amos v. Moseley*, 77 So. 619, 621 (Fla. 1917).

requires that the interests of the individual seeking the record be weighed against the public interest in confidentiality. *Nero,* 386 A.2d at 851-52. This balancing principle is very important in this proceeding, since mandamus requires that the petitioner's right to the relief be clear and indisputable. *Mulitauaopele,* 24 A.S.R.2d at 99. This standard therefore requires that the balance of interests be so clearly in Petitioner's favor as to be beyond dispute.

■ The Speaker contends that he initially withheld the requested information from Petitioner because the Inspector General of the U.S. Department of the Interior ("IG") was preparing to audit the Fono, and would need the records for that purpose. Private individuals cannot assert priority over public officials in the use of public documents for purposes such as auditing. *Bruce v. Gregory,* 423 P.2d 193, 197 (Cal. 1967). In the present case, however, the audit is now complete and the Speaker persists in his refusal to release the information prior to the issuance of the IG's report, on the ground that he wishes to prevent public misinformation about the contents of the records. The Speaker declines to decide whether he is willing to release the records after the IG's report is issued. We find the Speaker's argument to be wanting in merit. While we readily acknowledge that the public has an interest in receiving accurate information, it is positively dangerous to allow high ranking government officials to act as the supreme umpires of truth by arbitrarily withholding information regarding the expenditure of public funds.

■ A second consideration which the Speaker asks the court to weigh against Petitioner's right to view the records is that personnel records contain social security numbers, birth dates, and other personal data. Where a record contains some private information, mingled with public information, mandamus may compel an official to allow supervised copying of the public portions of the record while omitting the private. *Gleaves v. Terry,* 25 S.E. 552, 553-554 (Va. 1896). Accordingly, this argument is not conclusive in the Speaker's favor.

*III. The Respondent's Duty to Disclose the Information*

A. <u>Does the Duty Exist? Who Performs it?</u>

■ A duty to disclose the information exists if: (1) the information is public record; and (2) Petitioner's interest in the information outweighs any public interest in preventing disclosure of the information; or (3) the Constitution or statute is read to require disclosure.

Having established the existence of the duty, the question remains as to whom the duty is upon. The duty to distribute information to Legislators is upon the LFO pursuant to A.S.C.A. § 2.0601(b). In turn, the Speaker has a duty to disclose information requested by the LFO pursuant to A.S.C.A. § 2.0602.

■ Where the right to view a public record is established, mandamus may compel disclosure of the record by whomever is preventing such disclosure. *Ex Parte Uppercu*, 239 U.S. 435, 440 (1915).

B. Is the Duty Ministerial?

■ A writ of mandamus may not compel the reversal of a decision of a legislative leader, exercising the proper discretion of his legislative capacity. *State v. Bolte*, 52 S.W. 262 (Mo. 1899) (court refused to grant the writ where presiding officer of senate refused to sign a bill certifying its passage, after he ruled that it lacked a constitutional majority). Where the required act of a legislative leader is purely ministerial mandamus may lie to compel it. *Kavanaugh v. Chandler*, 72 S.W.2d 1003, 1005 (Ky. 1934) (writ should issue where Constitution directed president of the senate to sign a bill under specified conditions, and he failed to do so in the presence of such conditions); *State v. Osburn*, 147 S.W.2d 1065, 1068 (Mo. 1941) (Speaker of the House did not have discretion to refuse to declare the presumptively correct result of an election, even where there was a potentially valid dispute and protest to be filed). A duty is purely ministerial when it is mandatory and the officer has no discretion in the matter. *Id*. It is abuse of judicial discretion to direct performance of an action when an officer's duty requires the exercise of discretion. *Cartwright v. Sharpe*, 162 N.W.2d 5 (Wis. 1968). The same rule applies to legislative clerks regarding management of legislative records. *Stewart v. Wilson Printing*, 99 So. 92, 95 (Al. 1924).

The Speaker has discretion to subject the right to inspect public documents to reasonable rules and regulations. *Bruce,* 423 P.2d at 199. The speaker clearly has no discretion to refuse to cooperate with LFO; nor to deny a request for public documents in his custody, absent a legitimate public interest in confidentiality which outweighs the individual's right to inspect the documents. The Speaker's duty to allow inspection of public documents by Petitioner in accordance with common law, and by the LFO as a matter of statutory law, is therefore ministerial.

## C. Separation of Powers

Any action by the judicial branch of government to compel action by a legislative leader must be undertaken with pause and reflection in order to prevent judicial encroachment into legislative affairs. The cloak of immunity shielding the legislative branch of government from judicial intervention does not, however, extend to duties of a purely ministerial character. *State v. Osburn*, 147 S.W.2d 1065, 1070 (Mo. 1941).

In *Clough v. Curtis*, 134 U.S. 361 (1890), the United States Supreme Court considered whether a writ of mandamus should issue to compel the Secretary of the Territory of Idaho to release and amend documents purporting to be the record of proceedings of the territorial legislature. According to the plaintiffs, several members of the Territorial Legislature remained in chambers after the session had adjourned one evening, elected a Speaker of the House and a President of the Council, and passed 17 bills. *Id.* at 574. All of these proceedings were duly recorded by the Clerk of the House and transmitted to the Secretary of the Territory. *Id.* at 574.

A unanimous court held that it was not necessary to correct the record, or to decide whether the relevant body was a lawful legislative assembly. The Court found that judicial intervention into legislative record-keeping would violate separation of powers principles where there was no actual suit pending to adjudicate the rights of private parties which hinged upon the questionable legislation. *Id.* at 577.

Although the present case is arguably analogous and that issuance of the writ would amount to meddling in legislative record-keeping, there are some important differences. First, Petitioner is not asking that the records be modified, only that he be allowed to examine them. Second, the present matter does call for an adjudication of rights, since Petitioner is attempting to adjudicate an individual right to view the documents, and not merely to settle a legal question about the powers of the Speaker. Furthermore, the old English rule that a person's right to examine public records is contingent upon the prospective use of those records in a legal proceeding, has been replaced by the balancing test which weighs the interest of the individual in seeing the records against the interest of the community in keeping them confidential. *Nero*, 386 A.2d at 851-52.

## IV. Other Avenues of Relief

House Rule VI § 1 provides, "Any ruling by the Chair may be appealed to the entire membership and overruled by a majority of the members

elected and serving." At first glance, this rule may seem to provide a means of appealing the Speaker's decisions regarding the distribution of financial information. On further reflection the rule appears to be a means of appealing a committee chair's rulings or rulings by the Speaker regarding matters of parliamentary procedure and conducting legislative business, not a means of enforcing the Speaker's ministerial duties. Furthermore, evidence at the hearing seemed to indicate that efforts to compel the Speaker to release the records were somehow blocked by the Speaker's silence.

■ The question has also been raised whether declaratory relief is an adequate alternative remedy. American Samoa's declaratory relief statute, set forth in A.S.C.A. § 43.1101, reads in relevant part:

> Any person . . . who desires a declaration of his rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an action in the trial division of the High Court for a declaration of his rights and duties . . . . The court may make a binding declaration of such rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and such declaration shall have the force of a final judgment.

Accordingly, this court could potentially make a formal declaration of Petitioner's rights and Respondents' duties relative to those rights instead of issuing a writ of mandamus. The Second Circuit, lead by the venerable Judge Learned Hand, held that all judgments are in a sense, "declaratory" of the rights of the litigants, but a "declaratory judgment" in the legal sense is a judgment that calls for a broad "adjudication of rights other than those on which the immediate relief is dependent." *Corcoran v. Royal Dev.*, 121 F.2d 957, 958-59 (2d Cir. 1941). A judgment is not "declaratory" if it declares no more than is necessary to sustain the immediate relief prayed for. *Id.* As Respondents' concede, a declaratory judgment in this case would have the same effect as a writ of mandamus, in compelling the Speaker and the LFO to release House financial records. Petitioner does not ask for a declaration of his rights beyond what is necessary to decide this particular cause of action. Therefore a declaratory judgment is not an available remedy. Furthermore, a judicial declaration as to the powers of the Speaker without regard to underlying private rights affected by those powers, would surely be tantamount to judicial intervention repugnant to the separation of powers doctrine. *See Clough v. Curtis*, 134 U.S. 361 (1890).

## CONCLUSIONS

The Petitioner has a right to gain information regarding the financial affairs of the House of Representatives through the LFO, and the Speaker has a duty to cooperate with the LFO in its investigation. The Petitioner has a right to have his request for information and resulting work product kept confidential until he has reviewed the work product.

House of Representatives financial records are public record documents, and Petitioner has a common law right to review them since his interest in viewing them is not outweighed by a public policy interest in their confidentiality. If private information such as social security numbers and birth dates appear within these documents, the Speaker has the right to demand that the inspection be supervised to see that such private information is not copied.

## ORDER

On the foregoing, Mandamus shall issue directed to respondents, commanding:

1) the Speaker and his office to provide the LFO with a "breakdown of information concerning the 1994 House budget expenditures," as originally requested by Petitioner if such a breakdown exists. If a breakdown of expenditures does not exist, the Speaker and his office must make such information available as will be required for the LFO to create such a breakdown;

2) the LFO to present the results of its investigation to Petitioner within a reasonable time, not to exceed thirty (30) days, unless otherwise extended by the court; and,

3) the Speaker and his office to allow Petitioner to examine and copy any existing "breakdown of information" concerning House expenditures for 1994.[4] The Speaker may, if he chooses, require that the review be

---

[4] In Petitioner's letters to the Speaker and to the LFO he requests a "breakdown of information concerning the 1994 House budget expenditures," which seemed to indicate that he desired an accounting of expenses. At the hearing, Petitioner surprised the Speaker by asking for travel and expense receipts, personnel records and other such documents not specifically demanded prior to the hearing. Frankly, we are not entirely sure that we understand the particulars of Petitioner's request. Since the Speaker has not had an opportunity to respond to these requests, they are not properly the subject of judicial inquiry at this time. If Petitioner wishes to pursue a request for such documents, he should request

56

supervised in order to secure the integrity of the House's records and to prevent the copying of confidential personal data of House personnel such as birth dates and social security numbers, or to see that such information is blocked out on the copies.

It is so ordered.

---

them from the Speaker with sufficient specificity that the Speaker knows precisely what information is being requested.