Once upon a time those who chose to stroll to the Cadwalader property in Trenton would catch the view of an exceedingly picturesque ravine. Between its moss-covered banks and beneath a verdant canopy of overhanging boughs and migrant vines a stream flowed peacefully along the corridor, sparkling only intermittently from some intrusive ray of the sun. Its rare beauty inspired many to describe it as one of "nature's cathedrals."
Such was the charm and enchanting loveliness of the ravine when in 1908 the Cadwalader estate resolved to market its neighboring lands to the east. A map or plan, entitled "Supplementary Plan of Cadwalader Heights," was prepared and filed on January 31st, 1908, upon which the area then proposed to be sold is subdivided into numerically designated lots fronting on streets to be known as "Oak Lane," "Parkside Avenue," and "Stuyvesant Avenue."
In my judgment the most pre-eminent circumstances to be regarded in the consideration of the present cause are that the ravine at that time (1908) and for some time thereafter continued to exist in its natural primitive state and that although the plan discloses the extreme westerly boundary line of the Cadwalader property, it is noticed that the area through which the ravine extended is not subdivided on the plan into streets, lots, and blocks. I shall presently elucidate the cogency of those facts.
However, like many of nature's aesthetic gifts the ravine in the march of time fell prey to the mastery of man and became, perhaps conventionally, an overspread body of ashes. The site was recently acquired by the defendant and on April 10th, 1947, the defendant began the erection upon it of four groups of buildings containing residential units — an enterprise modernly described as a "housing project." The complainants insist that the project as contemplated by the defendant is violative of a neighborhood scheme of restrictive covenants which, it is asserted, embrace the area owned by the defendant.
The facts of this case are stipulated, so initially I shall recall the equitable principles which normally appertain to *Page 462 
this family of controversies and then apply the established principles to the acknowledged facts.
I have been taught by the adjudications of the past that restrictions upon the use of real estate are not viewed judicially with favor and that restrictive covenants are enforced in equity only when they are clear and reasonably definite with respect to the inhibitions sought to be thereby imposed.
Moreover restrictions limiting the use of lands are always to be construed strictly, and ambiguities and uncertainties in the restrictive provisions of grants are to be resolved in favor of the owner's free use of his property.
Equity does not bestow its aid upon one to enjoin another in the use to which the latter may choose to devote his land unless the right to such assistance is clear, and where the basic right is doubtful, equity withholds its extraordinary injunctive interference.
The equitable principles to which I have referred find expression in the following familiar citations: Fortesque v.Carroll, 76 N.J. Eq. 583; 75 Atl. Rep. 923; Goater v. Ely,80 N.J. Eq. 40; 82 Atl. Rep. 611; Howland v. Andrus, 81 N.J. Eq. 175; 86 Atl. Rep. 391; Camovito v. Matthews, 82 N.J. Eq. 218;88 Atl. Rep. 187; Underwood v. Herman Co., 82 N.J. Eq. 353;89 Atl. Rep. 21; Marsh v. Marsh, 90 N.J. Eq. 244;106 Atl. Rep. 810; Holman v. Parker, 94 N.J. Eq. 41; 118 Atl. Rep. 334;Trainer v. Calef, 96 N.J. Eq. 657; 126 Atl. Rep. 301; Paff v.Margerum, 103 N.J. Eq. 74; 142 Atl. Rep. 6; Bright v. ForestHill Park Development Co., 133 N.J. Eq. 170; 31 Atl. Rep. 2d190.
Advancing now to a circumspect observation of the acknowledged facts, I extract from paragraph six of the bill of complaint the restrictive covenants alleged to be typical of the neighborhood scheme.
"And Whereas, the said John L. Cadwalader and Richard M. Cadwalader, two of the said parties of the first part, for the purpose of securing sufficient ventilation, light, air and drainage, and to establish regulations and restrictions to insure the use for private residences of all the lots of land laid down on said `Supplementary Plan of Cadwalader Heights,' which, according to said plan, front on the same street, and lie within the same block as the premises hereby conveyed, have established in respect thereto, and to be obligatory and *Page 463 
binding upon the owner or owners for the time being of all and singular the said lots of land, the regulations and restrictions following — that is to say —
"1. That no buildings shall be erected or maintained on any of said lots except a single or double dwelling house, with such outbuildings as usually surround a private residence; that no single dwelling house that may be erected thereon shall cost, exclusive of the amount that may be expended for the grading of the grounds and for the erection of outbuildings, less than three thousand dollars, and no double dwelling house less than four thousand dollars; and that such dwelling house and outbuildings shall be of a rural or suburban style of architecture with all side and rear walls finished in keeping with the front walls.
"2. That the main front wall of each dwelling house shall stand at least twenty feet back from the line of the street on which said house shall front, provided, however, that bay windows may extend five feet and porches ten feet nearer said street lines.
"3. That no part of any dwelling-house or other building shall stand within two and one-half feet of any line dividing the lot on which it may be erected from an adjoining lot; provided, that each lot may be subdivided or enlarged by purchase or sale, but that no house as erected shall stand within two and one-half feet of the present or future division lines, and that no house shall be erected within five feet of any other house that may have been previously erected.
"4. That every stable or carriage-house erected upon any lot shall stand upon the rear of the lot, and such entire structure shall be at least eighty feet from the line of the front street.
"5. That no fence shall be erected or maintained upon the street line, or within twenty feet of the street line of any of said lots.
"6. That no wine, distilled or fermented liquor, or intoxicating drink of any kind shall at any time be sold or offered for sale, or publicly given away, and no trade, manufacture or business occupation of any kind shall be conducted upon any of the said lots of land.
"7. That these restrictions shall run with the land until January 1st, 1940, and thereafter until the owners of a majority of the lots lying in the same block and fronting on the same street, shall file in the office of the Clerk of the County in which said lands shall be situated, an agreement to rescind the said restrictions, or any of them.
"Now therefore, this Indenture further Witnesseth, That the said John L. Cadwalader and Richard M. Cadwalader, individually and as trustees as aforesaid, and said Mary Cadwalader Mitchell and Maria Cadwalader Hone, four of the said parties of the first part, and the said party of the second part, have mutually covenanted, promised and agreed to and with each other, and by these presents do mutually covenant, promise and agree, for themselves and their respective heirs and assigns, owner or owners of all or any of the lots of land laid down on said `Supplementary Plan of Cadwalader Heights,' which, according to said plan, front on the same street and lie within the same block as the premises hereby conveyed, that all and every of said lots of land fronting on said street and lying within *Page 464 
said block which remain in the said John L. Cadwalader and Richard M. Cadwalader, individually and as trustees as aforesaid, and said Mary Cadwalader Mitchell and Maria Cadwalader Hone, and the said lot of land hereby conveyed to said party of the second part, until the first day of January, nineteen hundred and forty, and thereafter until an agreement to rescind has been filed as hereinbefore provided, shall be used, remain and be held subject to the regulations and restrictions hereinabove set forth, and shall not be used nor occupied in any manner thereby prohibited; that all duties and obligations thereby imposed shall be done and performed by the respective parties hereto, and their respective heirs while owners as aforesaid; that until the date last above mentioned, and thereafter until the filing of the aforesaid agreement to rescind the covenants in this behalf herein contained shall run with the lands fronting on said street and lying within said block, and all and every part thereof, and shall be inserted or referred to in all future deeds or mortgages of said lands, or any of them executed by the parties hereto, or their respective heirs or assigns, owners as aforesaid, so as to subject the land hereby conveyed or mortgaged to the said regulations and restrictions; and that the said covenants shall inure to the benefit of, and be enforceable by or against all owners for the time being of any lands fronting on said street and lying within said block, who, or any of them, may bring suit at law or in equity to enjoin or redress any breach of the said covenants, or to obtain damages therefor; provided, however, that no person or persons shall be liable for any breach of such covenants other than such as may have been committed on the lands of and while actually owned by such person or persons."
The fundamental rule of guidance in undertaking to construe restrictive covenants is to ascertain, if possible, the intention of the parties as exhibited by a fair interpretation of the language employed. Rosenblatt v. Levin, 127 N.J. Eq. 207;12 Atl. Rep. 2d 627; affirmed, 129 N.J. Eq. 103;18 Atl. Rep. 2d 267.
In the present instance the common grantors have very definitely announced their purpose. I quote:
"for the purpose of securing sufficient ventilation, light, air and drainage, and to establish regulations and restrictions to insure the use for private residences of all the lots of landlaid down on said `Supplementary Plan of Cadwalader Heights' which, according to said plan, front on the same street, andlie within the same block as the premises hereby conveyed, have established in respect thereto and to be obligatory and bindingupon the owner or owners for the time being of all and
singular the said lots of land, the regulations and restrictions following." *Page 465 
My liberal indulgence in italicizing the foregoing recital permits an economy of comment upon the import and significance of the phraseology.
It remains only to notice that the area approximately 1,000 feet by 200 feet west of Parkside Avenue known as the ravine property and now owned by the defendant, was not divided into lots and blocks on the "Supplemental Plan of Cadwalader Heights." On it there are no designated lots "laid down" which "according to said plan, front on the same street and lie within" a delineated block. The so-called ravine tract is separated on the plan from the territory subdivided into lots and blocks by the roving street bearing the name Parkside Avenue. Was the ravine deemed to be the park alongside which the proposed avenue would extend? Is that circumstance explanatory of the winding course of the avenue and of its selected name? I am inclined to think so.
Moreover the restrictions related principally to the location and character of residences to be erected. The natural physical condition of the ravine property at that time rendered the land unfavorable for such a use. Then, too, the restrictions refer to the "line dividing the lot on which it [residence] may be erected from an adjoining lot" and that "every stable or carriage house erected upon any lot shall stand upon the rear of the lot." The plan did not indicate lots with dividing and rear lines in the area west of Parkside Avenue. Assuredly restrictive covenants cannot be stretched beyond their fair intendment, nor will the confine of such covenants be expanded by construction in order to accomplish what it may now be conjectured the parties would have desired had a situation which later developed been foreseen by them at the time when the neighborhood plan was originated.
It is stipulated that on July 15th, 1912, the "Estate of Thomas Cadwalader" conveyed the tract known as the ravine property in its entirety to one Edmund C. Hill without reference to any designated lots or blocks. True, the deed embraced restrictive covenants similar to those embodied in the conveyances of the lots sold under the "Supplemental Plan" of 1908, omitting, however, regulations relative to the limited proximity of buildings to the lines of lots. The deed contained *Page 466 
the provision that the restrictions therein should run with the land until January 1st, 1940, and thereafter until "the owners of a majority of the lots, lying in the same block and fronting on the same street, shall file in the office of the Clerk of the County in which said lands shall be situated, an agreement to rescind the said restrictions, or any of them."
It is acknowledged that none of the several complainants is the owner of a lot fronting on the westerly side of Parkside Avenue, and none except George E. Applegate and wife is the owner of any land within the boundaries of the ravine property. Mr. and Mrs. Applegate have title to a lot 25 x 162 feet on the northerly side of Stuyvesant Avenue. The complainants, however, seek to avail their properties of the protection of the restrictions imposed upon the ravine property by the conveyance to Hill.
Specific references to the successive transmissions of title are unnecessary. Suffice for present purposes to state that in 1928 one Harold G. Houghton was the owner of all of the ravine property "fronting" on the westerly side of Parkside Avenue. He mortgaged that property in favor of the Prospect National Bank on March 20th, 1929, and the bank acquired title by foreclosure sale on December 16th, 1936. On August 31st, 1939, Houghton executed and filed in the county clerk's office a release of the property from the operation of the restrictions. On May 5th, 1947, the bank conveyed the property to the defendant without restrictions. Such are the final chapters of the narrative of events.
The only discernible reason, if any, to believe that the grantor of the ravine tract intended to accord to owners of lots purchased under the plan of 1908 the benefit of the restrictions contained in the conveyance to Hill must be derived by implication from the provision authorizing the extinguishment of the covenants by the action of "the owners of a majority of the lots, lying in the same block and fronting on the same street." The phrase immediately introduces a precarious problem of construction. Was it intended to mean the lots fronting on both sides of the street (i.e., Parkside Avenue) between two intersecting streets, or lots fronting on the same street but lying within the same block or square enclosed by streets? *Page 467 
The word "block" has a generous offspring of connotations, but in the sense in which the word is used in covenants relating to the location of lots of land, I would normally ascribe to it the designation of a space, usually rectangular, enclosed by streets.Webster's International Dictionary (2d ed.). The preposition "within" is ordinarily accepted to mean "inside of," "in the limits or compass of."
The process of interpretation need not be further pursued because if it were to be conceded that the phrase is subject to the two incongruous meanings previously mentioned, the duplexity in meaning would oblige me under the settled authorities to adopt that which favors the owner's unrestricted use of the land, and especially so where, as here, such meaning would be consonant with a reasonable interpretation of the language in its application to the circumstances of the present case. Bullowa
v. Thermoid Co., 114 N.J. Law 205; 176 Atl. Rep. 596. To the same effect are: Williston on Contracts, § 621; Shepherd'sTouchstone 87, 88.
Moreover, to resolve that the phrase in question contemplated the acquiescence of the owners of the lots on both sides of Parkside Avenue would impose a reciprocal and probably unforeseen limitation of precisely the same restrictive effect upon all the owners of lots on the easterly side of that avenue, who had ample reason to believe that the boundaries of their neighborhood were exhibited by the Supplemental Plan of 1908.
The buildings sought to be erected by the defendant are being constructed on the portion of the ravine property "fronting on the westerly side of Parkside Avenue." Houghton was the owner of all of the land situate on the west side of that avenue and of almost all of the entire tract. His estate therein passed to the Prospect National Bank. The bank transmitted its title to the defendant by a deed in which it released the defendant from the observance of the restrictive covenants set forth in the former deed to Hill "to the end that the said party of the second part [the defendant] may and shall hold for itself, its successors and assigns, the premises heretofore conveyed free of and discharged from the covenants, agreements and restrictions as contained in said *Page 468 
[Hill] deed." "Party of the first part [bank] grants this surrender, release and discharge as it is the owner of the majority of the lots lying in the same block and fronting on the same street, and as this instrument shall be filed in the office of the Clerk of the County of Mercer, it is intended that this release shall comply with the provisions contained in said deed recorded in Book 372 of Deeds, page 456 as to the releasing of the restrictions contained in said deed * * *."
A party seeking to establish a neighborhood scheme of restrictions carries the burden of proof. Bennett v. Haerlin,112 N.J. Eq. 285; 164 Atl. Rep. 461. The right of the complainants to enforce the alleged covenants must be clear and satisfactory. Newbery v. Barkalow, 75 N.J. Eq. 128;71 Atl. Rep. 752; Wilson v. Ocean Terrace Garden Apartments, Inc.,139 N.J. Eq. 376; 51 Atl. Rep. 2d 549.
There is a formula in these cases which cannot be ignored. It is that where there is any doubt, from the language of the covenants or from any other admissible and evidential reason, whether the restrictions asserted apply to the lands in question, equitable assistance in the enforcement of such covenants cannot be granted. Underwood v. Herman Co., 82 N.J. Eq. 353;89 Atl. Rep. 21; Smith v. Reidy, 92 N.J. Eq. 586;113 Atl. Rep. 774.
In whatever a propitious pageant the facts of this cause are assembled, the fundamental and basic right of the complainants to enjoin the defendant remains nevertheless in a dim and indistinct frame. It is, of course, aphoristic that to doubt the right requires a denial of injunctive interference.
Decree accordingly. *Page 469