The genesis of the story of this case stretches back to the year 1888, in which the Sewaren Improvement Company acquired from one John Taylor Johnson the ownership of lands situate on the east and west sides of Cliff Road in Sewaren, in the County of Middlesex. Cliff Road was aptly named in that it meanders along the deviatory upper brink of the cliff which abruptly descends eastwardly some twenty feet to the beach land bordering on "Smith's Creek" and "Arthur Kill."
From the text of an illustrated booklet circulated by the company in 1899 I collect the following descriptive and informative passages: "On a bluff running along the water's edge, Sewaren overlooks the Arthur Kill Sound and presents an ideal location for a country home. One can find almost every kind of amusement incident to a summer place, particularly water sports." "Bathing facilities are unequaled for those who enjoy a dip in the salt water. A good sloping beach makes it pleasant and safe for all." "Sewaren is, pre-eminently, *Page 182 
a place for residences, and as such we wish to continue it."
The upland on the westerly side of Cliff Road, commanding an unobstructed view of the estuary and, more distantly, of Staten Island Sound was particularly desirable for residential purposes. The beach land extending easterly from the foot of the cliff to the water's edge was subdivided into lots numerically designated on a plan duly filed. Manifestly these lots were intended to be used by their respective owners in such recreational pursuits as boating and bathing. It was not uncommon for one who purchased a residential site on the westerly side of Cliff Road also to acquire the beach land lots in front of it. Doubtless an area having such characteristics and represented to be only nineteen miles by rail from New York City was at the advent of the twentieth century an enchanting locality.
Many relatively large residences were erected on the westerly side of Cliff Road, several of which are now owned by the complainants in the present cause. Some of the complainants are also owners of the beach land lots between their residences and the water front.
Doubtless Sewaren has changed in the passage of years. The world is a scene of changes as new things succeed those that grow old. Some of the photographs placed before me portray the unattractive condition of the beach land in the recent years. The vista across the sound to the shores of Staten Island, once so alluring, now falls upon a camp of huge petroleum storage tanks.
Upon its acquisition of the property in 1888, the development company in the sales of lots both on the upland and on the beach front uniformly embodied in the deeds of conveyance the following restrictive covenant, which I shall distinguish as covenant "A":
"Subject nevertheless to the following covenant: The said party of the second part, for himself, his heirs and assigns, doth covenant and agree to and with the said party of the first part, its successors and assigns, that the party of the second part, his heirs, executors, administrators or assigns shall not at any time hereafter sell, cause or procure to be sold upon the hereby granted premises, or any part thereof, or in any building now erected or hereafter erected thereon, *Page 183 
any ale, lager beer, wine or any intoxicating liquor of any kind or nature whatsoever. And the said party of the second part, his heirs and assigns shall not sell, permit or suffer to be sold on said premises, or any part thereof, in any building erected as aforesaid, by their grantees, lessees, tenants or by any person in possession of said premises, or any part thereof, any of the above named beverages or liquors or any intoxicating liquor or beverage whatsoever, and it is expressly understood and agreed that this covenant on the part of the said party of the second part shall attach to and run with the land, and it shall be lawful, not only for the said party of the first part, its successors and assigns, but also for the owner or owners of any lot or lots adjoining or in the neighborhood of the premises hereby granted, who have derived or who shall hereafter derive title from or through the said party of the first part, to institute and prosecute any proceedings, at law or in equity, against the person or persons violating or threatening to violate this covenant."
In the sales of the beach land lots, the company with some exceptions incorporated in the instruments of conveyance an additional covenant "B" of which the following is a typical transcription:
"And also that the said party of the second part, for himself, his heirs, executors and administrators, covenant and agree to and with the said party of the first part, its successors and assigns, that he and they shall and will use the premises hereby conveyed only for the purpose of private bathing and boating and that no structure shall be erected or maintained thereon except a private boat house or bathing house or except by consent of theparty of the first part or its successors, and that no such structure shall extend in height above the grade of Cliff Road." (Italics mine.)
The company seems to have been a family organization of which Robert De Forest was the president, and on December 18th, 1918, all of the beach land lots, in excess of one hundred, and other subdivisions remaining unsold were conveyed without restrictive covenants to Emily De Forest, who on May 15th, 1937, through the agency of Joseph P. Day exposed the lots then owned by her for sale at public auction.
The defendant is the present owner of beach land lots Nos. 75, 76, 77 and 78. He acquired title to lot No. 78 from one George H. Brown by deed dated February 8th, 1935; lot No. 77 from the Perth Amboy Savings Institution, April 2d 1937; lots Nos. 75 and 76 from the estate of William Brown, August 15th, 1941. *Page 184 
Shortly before the filing of the present bill of complaint, the defendant began the erection on lots Nos. 75 and 76 of a two-story structure containing living quarters which in fact rises in height a distance of ten feet or more above the surface grade and level of Cliff Road. The complainants have promptly protested.
Our decisions relating to the consideration of cases of this nature have been collated in recent decisions. To do so here would be needlessly redundant. Vide, Majeski v. StuyvesantHomes, Inc., 140 N.J. Eq. 460; 55 Atl. Rep. 2d 33.
I must be heedful of the rule that the party seeking to establish a neighborhood scheme of restrictions carries the burden of proof and that the right to enforce such covenants must be clear and satisfactory.
I must also be observant of the fundamental principle that restrictions limiting the use of lands of others are to be construed most strictly against the persons seeking to enforce them.
In cogitating the creation of a neighborhood plan of common restrictive covenants, we habitually turn to the informative pages of the concurring opinion of White, J., in Scull v.Eilenberg, 94 N.J. Eq. 759; 121 Atl. Rep. 788, which case, viewed in retrospect, seems to lead a formidable procession of subsequent decisions. Amid the noteworthy variety of divergent cases, I am not aware that this court has as yet definitely repudiated the formula for the determination of a neighborhood scheme expressed therein with polite amiability toward the earlier decision in De Gray v. Monmouth Beach Club House Co.,50 N.J. Eq. 329; 24 Atl. Rep. 388; affirmed, 67 N.J. Eq. 731;63 Atl. Rep. 1118.
In the present cause counsel initially inquire whether it was the intention of the company to create by means of covenant B a plan of restrictions to be uniformly and reciprocally applicable to the use of all the beach lands in the designated neighborhood. That such was the intention with respect to covenant A is perfectly evident from its express language and from the fact that all of the conveyances of the company contain that covenant.Lamonte v. Orlando, 97 N.J. Eq. 425, 426; 129 Atl. Rep. 442. *Page 185 
But it is at once significantly noticeable that the language expressive of the intended reciprocal character of covenant A was omitted in covenant B with which we are now concerned, and moreover in the latter covenant the company expressly reserved to itself and its successors the power to exercise volition with respect to the imposition of the restriction. The fact follows that of the 31 beach land lots originally conveyed by the company, four were not burdened by covenant B, one of which (No. 77) is now owned by the defendant. It may be that the defendant had notice of the restriction upon most of the beach front lots actually sold by the company, but he had notice as well of the reservation commonly embodied in the covenant.
I consequently pause to consider whether the qualification of covenant B negatives an intention of a general application of the restriction on a neighborhood basis.
There are two pertinent and authoritative decisions of relatively recent date which pilot me to a determination of that question. They are McComb v. Hanly, 132 N.J. Eq. 182;26 Atl. Rep. 2d 891, and Bright v. Forest Hill Park DevelopmentCo., 133 N.J. Eq. 170; 31 Atl. Rep. 2d 190. In the former the preamble of the restrictive covenant reads, "subject to the following restrictions and conditions applying to the property hereby conveyed only," and in the latter the covenant embraced the phrase "without the written permission of the parties of the first part, their heirs or assigns." In the case at hand the phrase is, "except by consent of the party of the first part or its successors."
It is the rationale of the cited decisions that such expressions, however literally styled, import the reservation of a choice or privilege by the common grantor capable of being exercised in each transaction and thus conclusively refute the supposition of any implied promise or intention of the grantor to impose the same restriction upon the lands unsold or to refrain from releasing the burden upon those already sold if in the judgment of the grantor the conditions should so warrant.
While it is not evident that the company exercised its reserved right to disengage a beach front lot from the restriction *Page 186 
theretofore applied to such lot, yet as previously stated, the company in 1918 conveyed all of its numerous unsold lots and subdivisions free from the restriction.
I quote from the decision of our Court of Errors and Appeals in the McComb Case, supra: "The vendor had a right to reserve to itself the power to deal freely with restrictive features as it saw fit in succeeding conveyances — to vary, modify or omit altogether. It was a definite notice in the initial conveyance that the grantor was reserving such right in itself. It continued to safeguard itself in this respect by repeating the limitation in its subsequent deeds to further purchasers, and it did, indeed, vary its restrictions in several respects in a number of instances as disclosed by the evidence in this case. There is no ambiguity in the language used in the restrictive covenants. It is difficult to conceive in just what fashion it would be possible for an owner of land to impose a covenant on a portion of his property without subjecting the rest of his property to a like burden if the language used in the restrictive covenants under consideration here does not do it. If purchasers of these lots had such notice of the existence of the covenant that they base their claim for relief on having relied on it, then they had notice of the limited terms of that covenant and of the fact that the contiguous and neighboring land was left unbound by it. The fact that the subsequent use of the restrictive covenant in later deeds tended by repetition to create a favorable neighborhood condition does not destroy the substance of the right originally reserved by the common grantor. That right was the privilege of adapting each transaction to the conditions as they might obtain in the course of time, and while grantor still owned other land in the neighborhood. This covenant was in writing in each case in which it was made by deed; the deeds were duly recorded, constituting the most effective constructive notice of the nature of the covenant. We do not think the facts of the instant case bring it within that class of cases in which a court of equity will intervene. All the rights that the complainants here could possess derive from the original restrictive covenants cited, and the opportunity to know the terms of such covenants and the limitations and *Page 187 
reservations, not merely implied but actually clearly expressed, was afforded to every person dealing with the lands."
I am not insensible to the force sought to be attributed to many of the circumstances, such as the substantial universality with which covenant B was attached to the beach front lots by the company in the early sales, and the conformity with which most of such lots have since been used, yet the authorities to which I have referred constrain me to resolve that here as in those cases the common grantor reserved control over the requirements and restraints for its own benefit and convenience in the purpose of enhancing the opportunities to dispose of its property without subjecting that which remained unsold to the limitations that arise from the creation of a neighborhood scheme.
In none of its deeds did the company promise to insert covenant B in its subsequent conveyances or obligate itself to comply with that restriction with respect to the use or improvement of its own lots in the same vicinity. And so these complainants or their predecessors in title acquired no right of action against the company for any infraction of the restriction.
I have not been supplied with a transcription of the evidence, but I seem to have grasped the impression at the final hearing that in the transmissions of the titles the complainants are prior grantees and the defendant occupies the situation of a subsequent grantee. If such is in fact the relationship of the respective positions of the litigants in this cause, then the complainants also collide with the established rule that since there was no contractual privity between the subsequent purchaser from the original grantor and the original grantee or the persons holding under him, a prior grantee cannot enforce the covenant against a subsequent grantee.
I refer to the equitable principle enunciated in the following cases: Leaver v. Gorman, 73 N.J. Eq. 129; 67 Atl. Rep. 111;McNichol v. Townsend, 73 N.J. Eq. 276; 67 Atl. Rep. 938; Bowen
v. Smith, 76 N.J. Eq. 456; 74 Atl. Rep. 675; Clarke v. Kurtz,123 N.J. Eq. 174; 196 Atl. Rep. 727.
In the present cause there was no dedication by the company of the beach land from which an implied covenant can *Page 188 
be said to arise. The plan filed by the company reveals that the beach land was subdivided into 154 lots, of which 127 were eventually conveyed by the company without the restrictive limitations of covenant B. It must be inferred that the purchasers of the 27 lots were aware of the qualifying reservation included in the covenant. Having resolved that a neighborhood scheme with its reciprocal rights and obligations was not intentionally created, the remaining circumstances of the case do not enable me to apply the doctrine of equitable easements in favor of the complainants.
A decree will be advised dismissing the bill. *Page 189